We've got pretty good luck in here. It's not all bad, it's not all bad. Oh yeah. The green is good. It's not jury. Just a quick question. These exhibits are in the record as they are. Is that correct? Your Honor, these exhibits are in the record but not as they are. The exhibits are taken from an exhibit in the record that is on page 54 of our record. This isn't a trial. This is a court of appeal. If you have something from the record, we have no objection to your showing it. If you have a compilation of something in the record, then that would be, I believe, inappropriate unless one of my colleagues feels differently about it. So I think if it's from the record and you're going to have a picture of it, great, we'll see it. Otherwise, I think we'll just go forward with the oral argument. Okay. Without reference to these exhibits. Thank you. What is it? There's a variety of exhibits. Good morning. My name is George McKay. I represent the appellants. This case is about, frankly, about some new employee supervisor who decided to lay off a bunch of people who were older and replace them with a bunch of people who were younger, saying there was a work slowdown. The exhibits to answer your question, Judge, can be as the chart, which was provided to us, which is on 54 of the record, which was provided to us by defendants in discovery, and then they tried to have it excluded, and then the judge rejected that, said it was relevant, it was provided during discovery and it was not hearsay. It was given to us by the supervisor who had access to the records and compiled all the people who were laid off, who quit and were hired during this time period. And this chart, the reason we made these other charts is that this chart includes people who were hired, laid off and retained, and we just separated them to the ones who were hired and who were laid off. Again, I think because this is not a trial court, we're not finders of fact. We review the facts in the record and we review the law, and I'm sure that being the able counsel that you are, you'll be able to argue those points. But I'm sorry we didn't know about this before. We could have saved you some trouble on it. But I think we should proceed based upon the facts in the record as they are and the legal arguments. Do you want to save any of your time for rebuttal? Yes, Your Honor. I'd like to save two minutes. Two minutes, okay. I have no problem with the charts being excluded. I was just answering. No, I'm saying you were answering Judge Canby's question. Why don't you proceed then, sir? Thank you. Today I'm going to focus on two issues. Did the district court use a proper standard regarding the factual issues in the light most favorable to the nonmoving party? And what primary facial test was properly used by the court, the Washington test relating to reduction of force, or some other test that required us to identify replacements in a situation where there was allegedly a reduction of force? The first obvious issue in which the judge, I think, just assumed facts that the defendants said, which we believe are untrue, that there really was a reduction of force in 2002, which would seem to be the ultimate issue in whether or not there's a legitimate nondiscriminatory reason, was there really a reduction of force? Well, if you look at chart on 54 and their chart on 90, in their brief on page 52 and page 22 in the brief, this Court, the defendants have a big hypothetical about what might have happened. They talk about how if there were 210 hours a month by workers, they actually could have needed 15 fewer drivers than they needed in 2001. So that's a hypothetical. You know what might be helpful, at least to me, the way we have to look at these cases is did your clients, you've got four different people here, four different circumstances, and they may not all be the same. You've got to show a primary facial case, then they've got to come back and show there's a business reason, then you've got to show whether there's a pretext. That's right, Your Honor. It would be helpful, at least from my perspective, if you've got arguments about whether you showed primary facial cases for each of these people, they'll come up with their spiel about the middle part, and then you could maybe deal with pretext, because we don't have a whole lot of time. We want you to get the biggest bang for your buck here in being able to talk to us and persuade us as to why the lower court was wrong. You can handle it however you want, but I think you're going to be more effective if you don't mind following that approach. Thank you, Your Honor. I'd be happy to do that. We certainly believe we established a primary facial case on all four plaintiffs. You have to show that they're in the protected class, their ages are all well over 40, which no one disputes. You have to show they had an adverse employment decision and they were, of course, terminated. You have to show that. Then the last part of the test is in the Washington test, you have to show that they were treated less favorably than people in the other, than other members of the non-protected class. How about Moreno and Renteria? Moreno, even though he was considered a stable and dependable worker, he was involved in at least, as I read it, two accidents, one involving an irrigation ditch in 1998 with a tractor, and another, I'm sorry, the irrigation ditch in 1999, a tractor in March of 2000, and another tractor in 2002. The last incident cost $10,000. He also lets an unauthorized person drive and yield produce equipment in October of 2001. Renteria operated that check-cashing business on the property without the consent of the farm. With respect to those two, not the other two, how did they establish a prima facie cause of action in this situation? Well, Your Honor, I think that the prima facie case they showed because they showed other people treated more favorably, but it might be an issue of pretext or legitimate reason. Treated as pretext. Let me talk to you about those people. Counsel, I think Judge Smith is asking specifically on the element of whether they were performing their job satisfactorily. Here we have someone who was wrecking tractors regularly and costing the company a tremendous amount of money, and you had someone else who was not only initially operating an illegal business on company premises, was told to stop doing it, and according to the record, apparently initiated it again. How are either of those two individuals satisfying that element of the prima facie case? Okay. Thank you, Your Honor. First of all, the district judge found that for the purpose of the prima facie case that people were doing their job properly. But let's talk about Mr. Marino. Mr. Marino allegedly caused damage to tractors on several occasions. There's two important aspects of that to Mr. Marino. The first is that the person that made the decision, Owen Brandt, everyone admits he made the decision. He says he made the decision based upon only the things that happened after he got there and things that he knew about. And he said he never looked at the record, which they claim to show that he didn't know they were old. I'll talk about that in a minute. But he says he only made the decision based on what he knew. So those earlier things that they reported to the EEOC, he didn't consider. So when they say to the EEOC that he considered those, he said to the contrary. So that's, once again, what I call a litigation fact compared to a witness fact. The witness who made the decision, and what is in Mr. Brandt's mind in this case, everything is everything. If he had illegal thoughts in his mind when he made these decisions, the defendant is liable. If he didn't, they're not. So we have the unique circumstances to decide what's in his mind. But he said that he did not consider any of those earlier problems. Now, for the last problem. Even with respect to the $10,000 accident, I thought that was the precipitating event in the case. I think it was. That's right, Your Honor. That was Moreno. Wasn't he fired the next day and specifically told that this was kind of the straw that broke the camel's back when he had $10,000 worth of damage to the tractor? He was let go the next day, Your Honor. And one thing to point out is that for Mr. Moreno, the plaintiffs always said that he was laid off for lack of work. And they say that in their answer. They say it in their summary judgment motion. So they say he was laid off for lack of work. But for that last incident, there's a clear dispute of fact. The only evidence they have on the record about that last $10,000 damage is a composition of he himself, Mr. Moreno. And he says, yes, he was driving the truck and, yes, the pin came out and, yes, it fell apart. But it wasn't his fault. In fact, he's upset that they were giving him defective equipment. They have nothing else that says that he was at fault. And they just the court and the defendants keep saying he damaged it. But he said, hey, I was driving it and it fell and the pin came out. It wasn't my fault. So I don't think that that shows anything about it. And there's certainly a dispute of fact. I mean, if they claim that he damaged it, there's nothing. They don't even have anything on the record that he did. But we have it on the record that he said he didn't. I think one really interesting, we talk about them not ñ well, let me talk about the number of people who were there in 2001 and 2002. As I said, they have this complicated scenario of how they could have used 15 fewer workers. But you look at the record in two different places. First, you look at their record on page 90. They tell you how many people they had on February 27th of 2001. Twenty-two people. There's a big chart of how many people they had every ñ page 90 of their record. A chart of how many people they had every week. And on February 27th, 2001, they had 22 people. Okay. So they claim they ñ around February 2002, they had this big work reduction. And they have a hypothetical to say they could have used 15 fewer people. So what do we do? We look at the chart, which they gave us, as to who was laid off and who was hired for Crew 94. And that's 54 of our record. And there you have to go through it and see who was actually hired and figure out how many people were in the actual crew. But when you do that, it shows you there was 23 people in Crew 94 on February 27th, 2002. And the reason we use 27th is because their chart from 01 is on a weekly basis and the week ends on the 27th. So we took the closest thing at the end of February, the 27th. There were 23 people. So the judge says it's undisputed that there was a reduction of force. The defendants talk all this time about the reduction of force. That's the whole base of this case. We had to reduce the force because of broccoli, supposedly, and we have a lot fewer people. In fact, they had one more person. So what kind of reduction of force is that? So that really goes to whether or not there's a legitimate reason. And so I'm not saying that the court should have automatically taken our argument that there was 23 to 22 shows there's no reduction, but that certainly is taking the best light to us. It's something one could consider. A trier-of-fact might want to consider that there's actually more people, so maybe there wasn't a reduction of force. Another classic example of not giving us the benefit of things is inferences. This Court has said clearly that we are supposed to – that the Court is supposed to give inferences to the nonmoving party. In fact, one case, the Hovey case, H-O-V-E, I'm going to try to pronounce that, but it says the Court must do so. The most obvious important inference in this case is did Mr. Brandt know more or less how old these people were? Did he know who was in the collective class and who was younger? And the defendant in the Court argued and the Court agreed that because Mr. Brandt did not look at the record, did not look at the employment records, he did not know how old they were. And we think there's an inference. And the Woodman case, which everyone talks about, the defendants talk about, we talk about, the Court talks about, I think the Woodman case stands strongly for the fact that you can – that an inference can be drawn if people work with somebody. Let's talk about the Woodman case for a second. The Woodman case, a TV company was taken over by an acquiring company, and they made layoffs. The Woodman court said you didn't show that the acquiring company knew these people ages, so there's no – you can't show the third part of this primary facial tape. That's the people treated more favorably or there was knowledge. But they – but they said, the Woodman case said, in other cases in which the decision maker actually knew the people, then it would be undeniable. Well, guess what? It was strongly denied in this case. So Mr. Baird knew these people and saw – worked with them every day. Everyone agrees with that. And – but they say because he didn't look at the record, he had no idea how old they were. And they also – I mean, they actually use a – and actually the Woodman court says this should be undeniable in case of age, race, and gender, maybe not so in religion and certainly not so in religion, but maybe – and maybe not so in case of disability. Defendants actually say, well, the person was black. How – how are they supposed to know that if – unless they look at the record? I mean, that is – that to me is silly. They say the Robertson case, Robertson v. Adams, saying – in which they said the person had – the employee had to know the person was black. Well, that case was a case in which there were people who applied for a job, sitting in the residence, but were not interviewed. And they said you have no reason to prove that – know that they were black. But obviously we work with them every day. If I decide to discharge Ms. Bridge here, my co-counsel, and she sues us for gender discrimination, which you probably would, am I going to say, hey, I didn't know she was a woman, I didn't look at her employment record? That's silly. And it's contrary to common sense. And all we need is an inference. The Court said we did not prove that Mr. Branton knew the – that's how we lost the primary facial case. You did not know Mr. Branton knew the ages of the people. But an inference that Woodman says is obvious and what all of us in everyday life to take for granted. We know someone more or less how old they are. I mean, we're talking about people who are 65, 63, compared to some people who are 20, 21, 19. If you look at the chart that's on page 54, they were rehired in 1920. You look at the – and so – But the record did show that the people who were hired in lieu of these four folks were, for the most part, some were in their 40s, some were in their 50s. And it's your position that these people looked distinctly different enough that Mr. Brant, merely looking at them, could tell whether they were, say, 60 or 55, as opposed to 50 or 45. These are seasoned farmhands all, right? Yes. I think they're all seasoned farmhands. Your Honor, the record, which is what we're all going on here, which is on page 54 of the record, these are the people who were – who were – these records say were hired and their ages. Somebody – the first one was 51. I mean, it was 31. The next one was 57, the only person who was older. 40, 31, 25, 19, 27, 23, 21, 20, 39. Those are all – I'm talking about – I'm talking about the people that replaced these four individuals. I thought the record did indicate specifically who replaced these people. Is it not? These are the people – they claim that we didn't show the people who replaced actual people. But I'm talking about the people – Crew 94 was a tractor crew which did a variety of jobs. These are the people who were hired in Crew 94, the ages. At the same time, our clients were let go. The age of the people – But, again, help me with the record here, if you will, Counsel. I thought the record showed that the people who replaced, with one exception possibly, the people who replaced these four individuals had certain skill sets that were as good or better than what your clients had and that they were hired based upon a changed need. I'm not saying what's true. I'm just saying what's in the record. Is that incorrect? It is true that defendants claim that some of the people who were hired, the younger people who were hired, had different skill sets. Now, but that's a disputed fact. I mean, there – we have both witnesses and depositions from plaintiffs and from defendants. In fact, the assistant supervisor, Mr. Guerra, said that some of the people that were hired had less qualifications than – Was it proper for the district judge to – since you had your information in, defendants had their information in, was it proper for the district judge to evaluate that evidence to determine whether there were any material facts at issue? Absolutely. That is what the district judge is supposed to do. And I think when you read the decision – I mean, the first half of the decision really does that. It says plaintiffs say this, defendants say this. But then when she starts making her decision, instead of saying, well, you know, plaintiffs claim this in this situation, but compared to this, I really don't think that's a material fact, she just assumes defendant's facts, like, for instance, that there was a reduction of force in which there was one more person. So that's no reduction of force. But she assumes it was. She said it's undisputed. Well, it's not. And that's, I mean – Well, you're talking about the totality of the people or of this particular unit or portions of the unit? Everything we talk about, Your Honor, is crude 94. Okay. Every single one, which ranges from about 23 in 02 and 22 in 01. So about that many people. Every single person. And so at the same time they were letting off our clients, they were, as this chart shows, hiring people who were 19, 20, 21, 23, 27, 25, 31, 40, et cetera. Do you want to save your rebuttal time? Yes. Okay. Hold that good thought. And let's hear now from Mr. Coulter, please. May it please the Court? Greg Coulter on behalf of the appellees. And good morning. Let me start specifically, that's what the judge did in this case, is compared the facts and found that there was no genuine issue of material fact as to those. And the judge looked at all the facts and in footnoting to the opinion said, even if I look at this fact, it's not enough. So the judge certainly did her job and looked at those facts, compared those facts, and came to a decision on those. With regard to the number 54, that is a chart which was pointed out is inaccurate. What is accurate is the payroll records that were provided. The inaccuracies in that 54 were actually taken by the judge and looked at and considered with the actual payroll records to come to the decision. And those payroll records are in the record attached to Mr. Redman's. Where did the 54, the chart on 54 come from? Mr. Redman made that chart during the EEOC proceedings. He doesn't know what he made it from, where those numbers came from. It's demonstrably false. That was discussed with him. Comparing the payroll records to them shows they're false. I mean, with regard to the four individuals who were close in time that came on to the crew or showed up in the crew on Exhibit 54, at least two of those individuals were current employees. Now, the chart lists them as new employees. That fact is incorrect. There are at least two people on the chart that, Gabriel Gillen and Sergio Hernandez, that if you look at the actual payroll records that are started paid at 87 of the supplemental excerpts, are not part of the crew. So the reliance on that chart for those types of things are incorrect. But I think what is interesting, going back to the payroll records themselves, is to look at who's on the payroll. What part is this in the record, the payroll? Starting at 87 on the tele-supplemental excerpts. And two things that are interesting in there. I'll continue with this payroll issue. Showing who was on, I print out, who was on this crew 94. And if you look at the ages of this crew, you realize that these are seasoned farm workers. I mean, the things that you can derive from here, the facts, the ages and the numbers apply not only to the initial prima facie case test, but also the issue of whether there's any pretext. You look at the individuals here for January 57, 47, 62, 42, 54, 53, 65. These are the ages of people that are making up this crew. These are the people who, despite what is said by the appellants, weren't laid off. 55, 37, 47, 58, 67. And if you look at those records in conjunction with number 90, which reflects the clear slowdown for various reasons in the record that I won't go into, basically efficiencies, farming efficiencies and advancements that are being made. Counsel, what about the track record of hiring by Mr. Brandt after he takes over as the supervisor for this particular group, putting aside the hirings that were made prior to that period? What about his track record of hiring? Well, he hired starting, we know, of 1, 58. The argument is being made that the hirings that he actually made were of, for ages much lower, generally speaking, than those before. And what you're citing, too, are people who are on the payroll record. Presumably a good number of those had been hired before Mr. Brandt came on. He's the person that has been identified as the discriminator, basically, in this. And his record started sometime in December of what he did. And if you look at his record of who came in and came off, you have various ages, including someone in January who was 58 that was hired. In order to do that analysis of what his record is, you have to look at the pool. The hiring system here is not you put an ad in the paper and you go out and take resumes and stuff. It's who shows up at the farm office on the day you need people. So if five people show up on the day you need people, the crop is ready to go, there's no mud in the fields, then you hire that person. The record does show that there's varying ages, including the December, and if you go on through that time period all the way through May, there are varying ages, including young people. So to say that that in and of itself shows that there's some sort of decision on his part to choose younger people, you also have to go back and say, well, how does he know who's younger and who's what? Is there any evidence of the pool? Is there any evidence of it? Is anybody keeping track of that or who shows up? There isn't evidence of what the pool looks like. You can look at what the crew looks like and determine what that is. I mean, the pool certainly changes, and in the times we're having in Arizona at this point, our pools are changing significantly as to who wants to do this work and what their ages may be. But to go to the point that showing that, from both prima facie case and certainly pretext, that there is some sort of conscious effort on there, there's simply not sufficient statistics. And maybe going back and looking at the Coleman case, there are some very good cases on these issues in the Ninth Circuit as to what do those statistics mean, what do those numbers mean, how do you put them together? I mean, can you compare qualifications? You have to be able to do that to make those work. Otherwise, that type of number and that type of statistic is really not very important and not very useful. So, and to hit on the prima facie case issue with regard to Moreno-Venturia, I think you hit really the issue. There's nothing in dispute about those two. They were, in addition to slowdowns, laid off because of their performance, and there's nothing in dispute as to those two. There are places in the record where different explanations are given by different people for this, and some say, well, it's just because we didn't need the workers at this time, so we let them go, and another would say, well, he's been damaging equipment, and, you know. There are some different, and they're not inconsistent. There are several cases, in fact, that talk about there is an inconsistency between work, I mean, specifically, work slowdowns, slowdown record, and poor performance or even fraud. Those types of things aren't inconsistent and considered more supplemental to each other. So in putting forward that there's a slowdown and looking at Mr. Redman's analysis of this, there's certainly a slowdown if you look at what the hours are and the numbers. In December, there's 17 employees. If you look, going over, and that's December of 2001. Going over to 2002, you see that the hours are drastically lower, and then beginning in April, begin to climb. And what's really interesting is if you also look at the percentage of man-hours worked as compared to the entire year, shows that this cycles up and down. And there are times when there's simply not enough work. So there is certainly a slowdown. A quick statement about the proper test here. This was a new test on appeal that they want to talk about. Understandably, there's flexibility in that. But reading into the cases that come along, Coleman, Nesbitt, Ritter, Washington, NIDS, it appears that in those cases, the distinction, at least in later cases, being made, the difference between letting someone go, an individual or a small number, versus, as in Coleman, where they had actual plans set up, and they were letting go hundreds of people for that analysis. I would submit that either analysis that you use, the claims fail on the prima facie case. There's no direct evidence here. The comments made by a foreman, there's cases talking about comments made by a foreman, certainly Coleman, and those other cases have extraneous comments that aren't attributed to a decision-maker. There's nothing here that attributes this to Mr. Brandt, who is the decision-maker in this case. I would submit a comparison of Coleman, specifically fact by fact, to this case. Demonstrates that there is not a prima facie case established. And getting to even a bigger issue, the legitimate non-discriminatory reason that, one, either the poor performance and damage to property, coupled with slowdown, or on its own, either one is sufficient, the slowdown itself. The documents put forward show that this is a slowdown. There's nothing to dispute that. So summary judgment would be proper on that issue. There's insufficient evidence. Kennedy. We're all four of the plaintiffs released at just almost simultaneously. The time periods for letting the plaintiffs go was January 19th, I believe, the end of January, and then February, then for the day after the damage to the accident, I believe it was February 6th for Mr. Reno, and then there was one on February 5th. So within about two weeks, I guess. Well, from the first one, Mr. Diaz, who was offered a transfer and didn't take the transfer to the other one, the whole span is a period of time of less than a month. The other two, about a period of a month. And if you look at the records of man hours for that year, there's certainly a decline. And if you look at the numbers, the payroll records of people who are actually performing work, it demonstrates that at the most you're looking at really 17 people that are performing work. And by the end of January, February, the numbers are drastically declined into, you know, the 18s and 19s who are actually performing more than, say, 50 hours of work or 70 hours of work. So the slowdown is occurring. And if you need half the number of man hours and you have reduced number of acres farmed, you clearly need less people to do that. Either that or you have a lot of people standing around, and that's not what's going to happen. When did people start coming into the crew? Or were they coming in all the time? When did people start coming into the group? Within the period of, in January, the individual who was Mr. Garcia, Mr. Garcia was hired, and he was 58 years old, and he was hired February 18th of 2002. Mr. Monroe was hired for a specific job, not a tractor operator, on February 7th, 2002. None of these plaintiffs are these greater operators. So he was hired for that specific job. Mr. White and Mr. Osamo say that they were hired in that, but if you look at the before that into that position. So that's a reflection of going to that record and looking at that chart instead of going and looking at the actual payroll record. I think I've addressed the inconsistency issue. Smith, there's simply insufficient evidence here to show a pretext because there's no reason it's actually discriminatory. So we'd submit that they failed to prove pretext and summary judgment was properly worded in this case and ask that the court inform that. Do you have any comment on the business of whether Brandt knew the ages or roughly the ages or knew they were? These, I think it was aptly put, these are seasoned farm workers. And the view of him looking at the crew and deciding he was going to let older workers go, he certainly didn't know their ages. The whole crew is an older group, and being seasoned farm workers, it's difficult to know anyone's age out there. So from the point of letting people go, no. From the point of in May, if he hired someone who's 20 years old, we're not going to say that he didn't understand that that person was 20 versus someone who may be older. But again, the ages range, and the test is substantial differences, not necessarily 40, you've got to be in the class, but it's a substantial difference. So during that period of time, there was people who were 47 years old, hired people 37 years old, people who were 58 years old who was actually older than Mr. Diaz, who was 55 at the time. So putting that together, there's simply not enough to make an inference that Brandt somehow had this undisclosed decision that he was going to get rid of older workers. Unless there's any other questions from the panel, I'll submit. Thank you, Mr. Colter. Mr. McKay, you have a very short bit of time left, but you're welcome to use it. Thank you, Your Honor. Where is the layoff? That's my question. I was thinking about the Wendy's, where's the beef, but where is the reduction in force? Once again, Mr. Colter talks about, oh, they have fewer man hours, this and that, that and the other thing, but you look at their chart that they gave us, there were at the time there was supposed to be a reduction in force, there was one more person. So where is the reduction in force? And we talk about the age differences. Look at the people who were this once again is in chart, and chart 54 is very important in this case. It's on page 54. The chart they gave us for Mr. Redmond during discovery, and they immediately said it was wrong, and they dispute a couple of people in that, two people I think of, they dispute that they were wrong, they had the dates, they were hired wrong, but the court said it's evidence. And so now he's saying it's wrong. He's saying you should ignore part of the evidence, which is in the record, because it conflicts with other parts of the evidence. Well, that might be a reasonable dispute just upon their own evidence. Anyway, you look at the people who were going through the how they're treated less favorably. Go once again to that chart on page 54. The people who were laid off from December to the end of February of December 1 to the end of February 2 were 54, 55, 66, 64, and 67. People who had less service than plaintiffs and who were retained, and their policy says that you're supposed to consider service even though they say they didn't do that. The ages were 20, 24, 37, and 43. 20, 24, 37, and 43 compared to 54, 55, 66, 64, 67, and 47. Now, I would agree that the 50, 47, and 43-year-old, by looking at them, you wouldn't be able to tell. But you can sure tell the 55 to a 20-year-old. You sure can tell a 66 to a 24-year-old. And once again, this is a circumstantial case because we had to ---- Mr. McKay, we appreciate your rebuttal. Thanks to Mr. Coulter and Mr. McKay. The case of Diaz v. Eagle Produce Limited Partnership is submitted.
judges: Canby, Smith, Larson